**MYERS et al. v. LOUISIANA & A. RY. CO.**

**No. 519.**

District Court, W. D. Louisiana, Shreveport Division.

Feb. 28, 1934.

98

Barnette & Roberts, of Shreveport, La., for complainants.

A. L. Burford and R. F. White, both of Shreveport, La., for respondent.

DAWKINS, District Judge.

The pleadings and issues in this case are set forth in an opinion handed down on February 6, 1933 (D. C.) 7 F. Supp. 92, on the application for preliminary injunction and will not be repeated. In that opinion reference was made to an amended petition filed January 5, 1933, as well as affidavits offered in support of its allegations, whereupon the defendant moved to reopen the case for the reason that the amendment had not been put at issue by answer and was pending upon a motion to dismiss. The matter was reopened, and an answer to the amendment filed. Thereafter, plaintiff's counsel filed a waiver of the right to a preliminary injunction, and the case was tried on its merits.

### Finding of Facts.

The plaintiff is a former conductor of the defendant company who holds his seniority as such if conditions should warrant his returning to work. He has been duly elected chairman of the Order of Railway Conductors, employed on defendant's lines, and has occupied that position since the fall of 1919; about 85 per cent. of the conductors on this line belonged to the union at the time this controversy arose; and plaintiff was recognized by defendant as the representative of the conductors and handled their claims and disputes with it until the present misunderstanding when it requested that the General Committee be convened. The officers of the defendant company, after requesting that the General Committee be convened to meet them, refused to deal further with Myers. The purpose of having the meeting with the committee was to permit the railway officials to bring to its attention their objections to the plaintiff as general chairman, particularly what they considered his arbitrary and offensive attitude toward them. These officers frankly stated their purpose not to deal with Myers further, and suggested that some other member of the order should be selected as general chairman, preferably a conductor in the service. It was their further view that a full time paid general chairman was unnecessary and unwarranted in view of the size of the property and the number of men employ-

ed. Defendant also took the position that, although it had been dealing with the plaintiff as general chairman of the conductors, and similar representatives of the other unions, it had the right under its contract with the men to require that it be met by the committee instead of the general chairman alone.

I also find from the evidence that Myers was exacting in his dealings with the officials of the company and his attitude and conduct towards them was not such as to inspire mutual respect and consideration each for the other. He undoubtedly had the right to present and urge the claims of the men whom he represented vigorously, but this did not require that he be insulting in doing so. The order was entitled to select its own representative, and the company was prohibited by the Railway Labor Law (45 USCA § 151 et seq.) from endeavoring to influence or coerce it in this matter. I think the evidence reasonably warrants the conclusion that the purpose of the defendant's officers in this instance was to have Myers removed as general chairman and some one else selected, and that the meeting with the committee was not to discuss any specific claim of the men. To that extent they were attempting to say, at least, who should not represent the order. In justification of this position, they relied upon what they conceived to have been the unreasonable and offensive attitude of Myers.

█ The object in having a representative of the men to deal with the company, whether it be a general chairman or committee, is to afford an opportunity, in line with modern thought, for collective bargaining, in which the positions of the parties are adverse in the sense that they deal at arm's length until an agreement has been reached. Elaborate machinery has been set up for handling their differences, both by agreement and by law, the principal purpose of which is to bring about amicable adjustments without resort to strikes or shut-outs. If either side permitted the other to dictate or influence the selection of its representatives, then there would be absent that fair means of dealing which is essential to satisfactory relationships. This is the reason the Railway Labor law has prohibited attempts on the part of the management of the carriers to interfere in such matters affecting its employees. At the same time, when appealing to a court of equity for the enforcement of his rights against others, the plaintiff should not himself be responsible for the condition of which he complains. Even though there was a clear legal right in the petitioner to compel the defendant to deal with him instead of the committee, I do not

think the court would be justified in so ordering, except upon the condition that the plaintiff conduct himself in a gentlemanly manner, so as not to be offensive to the self-respect of those required to meet him. He does not have the right, as some of the evidence tends to show, that he claims, to hire the conductors he represents to the railroad company, nor is the interest of the latter in their services confined to the question of paying their salaries.

█ Coming now to the question of who the company is entitled to insist shall deal with it in matters of this kind: I have looked in vain through the "Constitution, Statutes and Rules of Order" of the Order of Railway Conductors, for any specific provisions giving to this plaintiff the authority initially to handle alone disputes and claims of the men whom he represents. In his testimony, he refers to and relies upon "Art. 46, beginning with line 63, and Art. 50, on page 95," of the booklet just referred to. The provision first mentioned (beginning with line 63 of article 46) is as follows: "The Chairmen of said General Committees to constitute the General Committee of Adjustment for the system, to deal with matters beyond the jurisdiction of the General Superintendent, or on appeal from the General Superintendent, under the provisions of the law relating to General Committees of Adjustment."

With respect to the pertinent provision of section 50 relied on, I quote, beginning on page 94, as follows:

"When a complaint of a local nature is placed in his (the General Chairman) hands in accordance with the provisions of Sec. 45 of the Statutes, he shall, in conjunction with the local Chairman, if available, or a member of the division filing the complaint, proceed with an effort to adjust; * * * If unsuccessful, and he deems it advisable, he may convene the General Committee of Adjustment or as many members thereof including the secretary, as in his judgment are necessary to handle the business. * * * "

" * * * When a matter is placed in his hands which he considers does not justify a meeting of the General Committee, he may consult with the members of the Committee by mail, submitting to them the matter he has on hand, and it is the duty of each member to attend promptly to matters so referred. He shall act in accordance with the will of the majority so expressed and if a majority of the members of the General Committee favor a special meeting of the Committee or any part thereof, the Chairman will at

once communicate with the General Officers and arrange for a meeting. When the date of the meeting has been arranged, he will call a meeting for that date."

It will be noted that the language above quoted from section 50, beginning on page 94 (line 24), refers to a complaint of a local nature, "placed in his (the General Chairman) hands, in accordance with the provisions of Sec. 45 of the Statutes," and on turning to section 45, begining on page 75 (line 57), we find the following:

"When a complaint on the part of a member is made in proper form to a Division, if deemed necessary by the Chief Conductor, a special meeting may be called for the purpose of considering the matter. No complaint will be considered that is not reduced to writing, setting forth all of the facts surrounding the case, a copy of which shall be furnished each Division of the Order located within the jurisdiction of the same Superintendent."

"Any member of the Order and any conductor, as the term is defined in Section 19 of the Statutes, will be entitled to the protection of the Order of Railway Conductors when his complaint is submitted in writing to the division having jurisdiction over the track upon which the man is employed. * * *"

"If a Division approve a complaint from one of its members and request another Division to have its local committee handle the case, etc. * * *"

"If the Division, by a two-third's vote of the members present who are employed in actual railway service approve the complaint, the Division shall refer it to the local committee for the line against which the complaint is made, *directing them* to proceed with an effort to adjust the same with the local officials. *It shall be the duty of the Local Committee* to make an effort to secure an answer in writing, to all complaints, from the Railroad Officials to whom they are submitted. Such answer they shall submit to the Division with their report. The Committee shall report to the Division the result of their efforts, and if unsuccessful and it is deemed advisable, the Division may place the matter in the hands of the Chairman of the General Committee of Adjustment for that system of Railway. Except that on lines where salaried chairmen are employed, the matter may be placed in his hands without further action by the Division. * * *

"Local committees must not take complaints to the general officers of the road except through the Chairman of the General Committee of Adjustment." (Italicizing by the writer.)

I think it reasonable to deduce from the above that the complaint shall first be handled by the local committee, where it is of a local nature, and if they are unsuccessful, then it may be referred to the General Committee of Adjustment, or where there is a salaried chairman, the matter may be placed in his hands without going through the General Committee. But in view of the last quoted provision above, the local committee cannot take complaints "to the General Officers of the road, except through the *Chairman of the General Committee.*" This latter provision, I think, contemplates a system where there exists a number of divisions and general officers, as distinguished from the division superintendent, or officer directly in charge of the operation of the particular property. In the present case, the officials occupy the latter relation to the matter, that is, as I appreciate it, the entire property is under the direct charge of the president, superintendent, and trainmaster, with whom the plaintiff has sought to deal.

It is easy to see from the above that matters, such as are recited in the original and amended petitions in this case, can under normal conditions be more expeditiously handled by the chairman directly with the officials. That had been the practice between the plaintiff and defendant for more than ten years preceding this controversy and is still followed as to other railroad unions. But when persons disagree, and a court is called upon to determine their rights, that construction must be adopted which will give effect to the language used in its usual sense, unless the practices and usages, followed with mutual consent, have acquired such force as to amount to an amendment of the written word. I scarcely think that any single representative could, by handling complaints of members of the order against the railroad in the manner used in this instance, bring about a repeal or amendment of provisions of the statutes enacted by the organization as a whole for its government.

The idea that the committee first acts with the chairman, at least primarily, in handling complaints, seems to be repeated in section 48 dealing with the "Duties of General Committee," as appears from the following: "It shall be the duty of each General *Committee* of Adjustment to carefully investigate all matters lawfully placed in *their* hands, and they shall have the power to alter, amend, add to or strike out any part, or all, of any complaint submitted to them. After *they* have

*agreed* upon any claim or complaint, *they shall proceed with an effort to adjust the same* with the general officers of the road. * * * After they have exhausted all honorable efforts in their power without reaching a satisfactory settlement, the Chairman may call the President to their assistance. If the Chairman has complied with Section 50 of the statutes, the President shall give such calls the earliest possible attention. He or his legal representative shall be clothed with the same authority, after matters have been placed in his hands, that was *originally held by the General Committee of Adjustment."* (Italicizing by the writer.)

The chairmen of the general committees constitute the General Committee of Adjustment on systems where there are divisions under the control of "separate general superintendents," and the president of the order has authorized the organization of general committees in such divisions.

Then again, in the contract between the division of the order whose members are employed on this railroad, it is provided that in matters of discipline any conductor shall have the right to a hearing if he "considers himself unjustly treated * * *." "And at the hearing or on the appeal, the employee *may be* assisted by a committee of conductors or by one or more duly accredited *Grand Lodge Officers."* Article 33.

Article 50 of the contract also provides as follows:

"(a) The General Committee of the Order of Railway Conductors, will represent all Conductors in the making of contracts, rates, rules, and working agreements and interpretations thereof.

"(b) All controversies affecting Conductors will be handled in accordance with the interpretation of the Conductors' contract as agreed upon between Management and the Committee of the Order of Railway Conductors.

"(c) In matters pertaining to discipline, or to other questions not affecting changes in Conductors' contract, the officials of the company have the right to meet any of their employes either individually or collectively."

■ In section (a) of article 50 the order agreed with the Railway Company that the "General Committee" should "represent" it and its members "in making contracts, rates, rules and working agreements and interpretations thereof." The complaint or grievance of an individual conductor, such as those alleged by the plaintiff, may or may not involve an interpretation of the contract, rules, or working agreement. However, section (b) of this article is broad enough to cover "all controversies affecting conductors" which it was agreed should "be handled in accordance with the interpretation of the conductors contract as agreed upon between Management and the Committee of the Order of Railway Conductors." These provisions, no doubt, were incorporated, in so far as representation of the order was concerned, at its instance to maintain the principle of collective bargaining. It was also in line with the provisions of the order's statutes heretofore quoted and referred to in the initial stages of negotiations. This agreement between the parties, however, did not, in my judgment, have the effect of nullifying the provisions of the "statutes" governing subsequent steps in the handling of disputes, after conferences between the committee and the management had failed. Nor did it prevent the use of the other agencies set up by contract between this and other carriers with the national organization, and by law for the settlement of such controversies. I find no conflict between any of these remedies, but each appears to supplement the other as consecutive provisions for avoiding resort to strikes and lockouts.

It is my view that the quoted portions of article 50 of the contract do not include interpretation of the orders "Constitution" and "Statutes," but only "contracts, rates, rules and working agreements" between the carrier and the conductors.

■ The plaintiff neither alleges nor has he proven a compliance with the requirements laid down in the order's "Statutes" above quoted to show himself entitled to press the several claims alone as general chairman. The record shows that he either took them up verbally or by letter, without their having passed through the channels provided by the rules. On the other hand, it appears that the defendant does not desire the convening of the committee for the purpose of discussing any particular claim or dispute with its employees as such, but simply to present to them what it considers its grievance against the plaintiff as a proper person to represent the order, which I think beyond the scope of matters properly to be considered in such a conference. I believe, as pointed out earlier in this opinion, the question of who shall represent the men is their business alone. If the defendant were permitted to object to the selection of the plaintiff, it could likewise as to any other chairman, and by a process of elimination, select one satisfactory to itself. This is contrary to the letter of the Railway Labor Act, and the spirit of fair dealing be-

tween the order and the carrier. As the matter now stands, and reduced to its final analysis, the plaintiff contends that he is the sole authority entitled to take up and handle all matters affecting the conductors, without the consideration of any one else; and the defendant insists that it is entitled to meet the General Committee, not 'for the purpose of discussing the complaint of any employee, but to present its dissatisfaction with the plaintiff and to have another representative selected. In my judgment both sides are wrong in their positions. When, and if, the plaintiff shall present one or more real, live, and concrete cases, which have been handled to the point of his right to represent the aggrieved party, or parties alone, then the defendant will have no lawful basis for declining to meet him because he is Myers; but if that time shall come, then the latter must conduct himself as a gentleman, with proper respect and regard for the officers with whom he shall deal, and if he fails to do this, and this court should later conclude to order the defendant to meet him, it would have the right to apply to the court to be relieved from dealing with him further until such time as he sees fit to comply with the ordinary rules of decent conduct as between gentlemen. Of course, in such a conference, if the parties disagreed, then it would be time to call upon the other agencies, provided by the contract and by law for settling the dispute. I do not believe the matter has reached such a stage under the circumstances revealed by this record. It is true that the plaintiff did attempt to initiate proceedings for having the question of his right to require the defendant to confer with him referred to the Board of Mediation, but my view is that this is not a matter coming within the scope of the authority of that agency. It seems clear to me, as pointed out above, the defendant is entitled to no voice in the question of who shall represent the conductors, and its attempt to do so is prohibited by the Railway Labor Act.

It is further my view that the finding of facts in regard to the activities of the defendant toward influencing the men to select another general chairman, announced in the opinion on the application for preliminary injunction, is sustained by the hearing upon the merits, and a writ of prohibitory injunction will be granted against further acts of this nature. The demand of the plaintiff for a mandatory writ will be denied for the reasons above given, but he will be allowed to renew the application upon a proper showing. Proper decree should be presented.